IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES** : | |
| : | |
| : | |
| **v.** : | **Case No. TDC-22-0048** |
| : | |
| **THADDEUS WILLS,** : | |
| : | |
| **Defendant** : | |

## REPLY IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS

Thaddeus Wills, the Defendant, by and through Andrew R. Szekely and Nate Smith, Assistant Federal Public Defenders, hereby files the following reply to the government's response in opposition to Mr. Will's Motion to Suppress Statements. Mr. Wills argued in his Motion that suppression is required because (1) his statements were obtained in violation of *Miranda*, (2) his statements were involuntary, and (3) a portion of his statements were taken in violation of the prompt presentment rule. Mr. Wills rests on his previous arguments regarding voluntariness and prompt presentment and intends to develop the factual record to support these claims at the February 7, 2023 hearing. This reply brief addresses only Mr. Wills' *Miranda* claim.

## ARGUMENT

The government largely agrees with Mr. Wills as to the law applicable to his *Miranda* challenge. The government concedes that if "affirmative deceit" or "misinformation" lead to a *Miranda* waiver, that waiver that is not knowing, intelligent and voluntary. ECF No. 149 at 6. Thus, all appear to agree that the critical question is whether the officers in this case misled Mr. Wills as to the "true nature of the[] investigation" and caused him to waive his *Miranda* rights. *Id.*

Yet the government still argues that Det. Gregory "made no . . . effort to deceive" Mr. Wills, and thus that his *Miranda* waiver was valid. *Id.* at 7. Here, the parties dramatically part

1

ways. Mr. Wills' interrogation—from the moment Det. Gregory entered the room at 11:23 a.m., to when the officers served their DNA warrant upon Mr. Wills at 5:49 p.m.—was an hours-long ensemble of deception. The officers' clear goal was to put Mr. Wills at ease and keep him talking by concealing the pivotal fact that he was the target of their investigation. While the government tries to divide and conquer the officers' myriad misleading or false assurances and blunt each statement's impact, the government misinterprets the officers' words and wrongly ask the Court to ignore the forest for the trees. This is precisely the sort of deception that vitiates a *Miranda* waiver, and Mr. Wills' statements must therefore be suppressed.

**I.     The Facts Demonstrate that the Detectives Repeatedly Misled Mr. Wills About the Nature of Their Investigation and the Consequences of His *Miranda* Waiver.**

In assessing whether deception invalidates a defendant's waiver, the Court assesses "the totality of the circumstances." *United States v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2012) (quoting *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir.1997) (en banc)). The totality of the circumstances here show that the officers employed a conscious strategy of deceiving Mr. Wills as to the nature of the investigation. This strategy had several ingredients: the officers dishonestly claimed ignorance about the reason Mr. Wills was in custody; the officers falsely claimed they only wished to speak to Mr. Wills about investigations in which he was "not a suspect"; the officers downplayed and devalued the importance of the Mr. Wills' *Miranda* warnings; and the officers avoided questioning Mr. Wills in a manner that betrayed their true aim. The government tries and fails to mitigate each of these misleading ingredients in isolation, and fails entirely to reckon with the officers' clear overarching strategy. Mr. Wills delves into the relevant facts below.

    *1.   "I am trying to figure out what your paper is for."*

The officers' deception began nearly the moment Det. Gregory began speaking to Mr. Wills. Just moments into the interrogation, Det. Gregory told Mr. Wills that he was "trying to

figure out what your paper [*i.e.*, warrant] is for." Ex. 1-B at 14:34–14:39. Det. Gregory's meaning here is clear: he was saying he did not know about Mr. Wills' warrant or the reason he was in custody. This statement was entirely false. Just one day earlier, Det Gregory coordinated with Virginia authorities, passing along evidence of Mr. Wills' alleged involvement in Prince William County of a Sheetz gas station and assisted officers in obtaining the arrest warrant. Ex. 3-C at 5 (Prince William warrant noting Charles County detectives' involvement). Det. Gregory then made sure Mr. Wills was arrested on this warrant at the courthouse in Charles County. Indeed, far from having no idea about origin of the warrant, Det. Gregory slyly questioned Mr. Wills about this very robbery while concealing his motive for doing so. Ex. 1-B at 1:52:36–1:52:45 ("Talk to me about that day, man. You got wrapped up in some shit. . . . That's in Virginia at the Sheetz."). Quite plainly, then, Det. Gregory lied when he claimed ignorance about the reason for Mr. Wills' arrest.

Even the government does not seriously resist this conclusion. The government concedes that "at most, Det. Gregory represented that he did not know about the Prince William charges." ECF No. 149 at 8. Elsewhere, the government admits that in fact Det. Gregory "*was* aware of the Prince William County arrest warrants." ECF No. 148 at 2 (emphasis added). The government's only defense regarding this statement is that it was "not in response to any question by Wills." ECF No. 148 at 8. But the fact that Det. Gregory volunteered the lie does not mitigate its dishonest nature or impact. If anything, it was more deceptive for Det. Gregory to offer a falsehood unprompted than to respond falsely to a question. Therefore, despite the government's attempts at minimization, the statement by Det. Gregory was objectively false and "affirmatively misle[ading]" to Mr. Wills. *United States v. Giddins*, 858 F.3d 870, 884 (4th Cir. 2017).

### 2. *"You are not a suspect in this, but if you're hearing stuff, obviously I want to know."*

Det. Gregory quickly exacerbated his deception about the warrant. Just seconds before he read Mr. Wills' *Miranda* warnings, Det. Gregory said he was interested in whether Mr. Wills was "heard some stuff" about a different, unrelated murder. Ex. 1-B at 14:39–14:43. He further assured Mr. Wills by telling him he was "not a suspect in this." *Id.* at 14:43–14:48. It is clear in retrospect that Det. Gregory was first and foremost hoping to extract inculpatory statements from Mr. Wills about his own alleged criminal conduct, not about the unrelated murder. It was therefore highly misleading for Det. Gregory to frame the interview as focusing on other investigations in which Mr. Wills was not a target.

The government again attempts to minimize. It argues that Det. Gregory did not literally lie to Mr. Wills by telling him he was "not a suspect" because Det. Gregory was referring to the unrelated murder in which Mr. Wills was "not a suspect" as opposed to the offenses at issue in this case. ECF No. 149 at 8. This response misses the point. Det. Gregory clearly meant Mr. Wills to think that the purpose of the interview was for Det. Gregory to ask about others' alleged wrongdoing, not Mr. Wills'. That was not true. Det. Gregory's intent was to gather evidence of crimes for which Mr. Wills *was* a suspect. Thus, the government is wrong that "Det. Gregory did not misrepresent Wills' status about being a suspect in the matters for which he was about to question him." ECF No. 149 at 8.

Citing *United States v. Van Metre*, 150 F.3d 339 (4th Cir. 1998) the government also mentions that Det. Gregory had no obligation to disclose "the identity of the specific offense for which Wills was being questioned," ECF No. 149 at 8. The dicta to this effect in *Van Metre* have no bearing on Mr. Wills' case because Det. Gregory did not merely fail to disclose the nature of the charges, but affirmatively deceived Mr. Wills into waiving his *Miranda* rights. Det. Gregory lied to Mr. Wills about the purpose of the questioning. This caused Mr. Wills to be "misled . . . as

4

to the nature of the[] investigation" and deprived of a fair opportunity to make an informed decision about whether he needed to remain silent or get a lawyer. *Giddin*, 858 F.3d at 884. This is very different from failing to take the affirmative step of failing to disclose suspected charges as discussed in *Van Metre*.

### 3. "I am going to advise you of your rights because you are in here . . . I am going to read it to you for the technicality."

Det. Gregory also downplayed Mr. Wills' *Miranda* warning, deepening the deception already at hand. Immediately before Det. Gregory read from his *Miranda* card, he told Mr. Wills he was going to read him his rights "because you're in here" (*i.e.*, the interrogation room) and "for the technicality." Ex. 1-B at 14:48–15:01. Coupled with Det. Gregory's previous comment that Mr. Wills was "not a suspect" in the crimes the two were about to discuss, Det. Gregory's obvious implication was that Mr. Wills did not need to seriously consider his *Miranda* warnings. This too misled Mr. Wills about the nature of the investigation that was afoot. *See Giddins*, 858 F.3d at 876 (officers told suspect they had to read rights "because his car was involved in a crime"); *cf. Doody v. Ryan*, 649 F.3d 986, 1003 & n.4 (9th Cir. 2011) (disapproving of "downplay[ing] the warnings' significance" because this practice tends to misinform a suspect regarding his *Miranda* rights). The government does not try to explain away this aspect of the officers' deception and it should be considered in the totality of the circumstance.

In fact, the government's only defense in this regard is that downplaying the importance of the rights had no effect because Mr. Wills said before the warning that he knew his *Miranda* rights. ECF No. 149 at 7. This fact has no relevance. The issue is not whether Mr. Wills knew the substance his *Miranda* rights, but whether Mr. Wills was deceived as to whether he should exercise them. Indeed, Mr. Wills likely appeared so confident in glossing over the *Miranda* warnings because he was deceived as to whether they were necessary in the first place.

5

*4. Focusing on others' alleged criminal conduct.*

Finally, the officers perfected their ruse by carefully keeping the focus of their questions on others' alleged wrongdoing and not betraying the true target of the investigation. The government seems to suggest that the officers did not consciously craft their questions to mislead Mr. Wills about the target of the investigation. Yet, this is exactly what the overwhelmingly evidence from the interrogation demonstrates.

Det. Gregory began implementing the strategy by explicitly focusing his question on the actions of others, mostly Quasean Reeves but also Keionta Hagens. *See, e.g.*, Ex. 1-B at 1:02:30–1:02:35 ("Man, listen. Have you seen Quasean recently?"); *id.* at 1:09:21–1:09:25 ("Qua, man, he has lost his mind."); *id.* at 1:11:30–1:11:41 ("Especially with Qua's background, he definitely shouldn't be flashing the brass . . . Do you agree?"); *id.* at 1:13:05–1:13:10 ("You need to be careful, though about letting Qua bring you into shit too."); *id.* at 1:16:20–1:16:42 ("So you think Qua is going to show up for court tomorrow? . . . Man, we need to keep him as straight as we can."); *id.* at 1:17:00–1:17:07 ("I am afraid he is going to wild out and be on the run as long as he can and he will pick up some shit and then he is looking at more years."); *id.* at 1:17:08–1:17:10 ("What is [Reeves] on man? Is it just coke or—"); *id.* at 1:19:13–1:19:16 ("How could we get a hold of Qua"); *id.* at 1:32:00–1:32:06 ("Look man, I want to show you some of this shit Quasean is doing."); *id.* at 1:37:13–1:37:17 ("What was [Reeves] doing this day that this was shot?"); *id.* at 1:38:30–1:38:35 ("But does Qua and Keionta, do they hang out there?"); *id.* at 1:46:40–1:46:45 ("Listen man, if Quasean was on some hot shit, what would he be doing?"). When Mr. Wills adopted a skeptical tone and expressed confusion about the myriad questions about Mr. Reeves, *id.* at 2:13:30–2:13:50 ("[Y]ou asked a lot of questions about Qua— "), Det. Gregory justified his inquiry by stating that Mr. Reeves was "wild and out" and by citing his reasons to want to keep Mr. Reeves straight, *id.*

The next officers kept Det. Gregory's ruse going, less by explicitly asking about others' potential alleged conduct and more by studiously avoiding mention of any potential wrongdoing by Mr. Wills. Prince George's County detectives Phillip and Paz questioned Mr. Wills from 2:48 p.m. to 3:50 p.m. Not once during this time did the detectives mention that they suspected Mr. Wills of a crime. Instead, they asked him facially innocuous questions about his general whereabouts over the past several days. The detectives interspersed their queries with friendly chit-chat. Much of the conversation consisted of Mr. Wills engaging in small talk and telling unrelated stories, him still being oblivious that he was the true target of the detectives' investigation.

Finally, Prince George's County's Det. Akers and Sgt. Stickle finished the interrogation, questioning Mr. Wills From 4:41 p.m. to 5:30 p.m. These officers returned to Det. Gregory's more explicit misdirection. Det. Akers claimed that he was questioning Mr. Wills because he was "looking at Quasean for a bunch of stuff. And . . . he has been staying at your place and stuff, right?" Ex. 1-B at 5:33:40–5:33:52. Then, like Det. Gregory, Det. Akers repeatedly suggested that he was only interested in Mr. Reeves while surreptitiously trying to gather information relevant to Mr. Wills' conduct. *See, e.g.*, *id.* at 5:34:29–5:35:32 ("[W]hat has he been up to the last couple weeks?"); *id.* at 5:39:11–5:39:15 ("[H]ave you seen him in the last couple weeks?"); 5:41:50–5:41:56 ("Have you been around him a lot?"); 5:56:58–5:57:03 ("Who does Quasean—who has he been hanging out with lately then?"); 5:58:03–5:58:12 ("How does he make money? . . . I mean, does he sell—?"); 6:00:48–6:00:51 ("So does he do anything besides weed?"); 6:01:02–6:01:05 ("Did you ever see him deal coke?"); 6:05:27–6:05:40 ("[W]as he driving like a blue Chevy Cruze for a little while?"); 6:06:49–6:06:57 ("[I]s he just trying to make quick bucks and that is why is he doing kind of what he is doing?"); 6:07:40–6:07:57 ("[W]e want to either clear his name or whatever. Unfortunately, his name has come up a couple of times in ARS and that is why we are

7

trying to figure out, like what his involvement is."); 6:09:16–6:09:21 ("[D]oes he know anybody on Simms Lane?"); 6:12:25–6:12:50 ("[W]e are looking at Quasean, okay? He has been IDed by multiple people. So, that is what I am trying to figure out, like what is his role?"). To be sure, Det. Akers probably was interested in Mr. Reeves' criminal conduct. But his chief goal was to gather incriminating evidence about Mr. Wills' role in crimes allegedly committed in concert with Mr. Reeves. For Det. Akers to suggest he was talking to Mr. Wills because he was *only* interested in Mr. Reeves was misleading and deceptive, and this ploy both relied upon and amplified the deception of the previous officers. To Mr. Wills, this line of questioning maintained the message that had been implicitly and explicitly delivered for hours: that the nature of the investigation was to uncover the crimes of others.

In over six and a half hours, only one officer referenced wrongdoing by Mr. Wills. Between 12:57 and 1:01 p.m., Det. Gregory asked Mr. Wills if he was "wrapped up in some shit" at a Sheetz in Virginia. However, this statement must be viewed in context and ultimately did not significantly mitigate the deceptive nature of the strategy the officers employed in questioning Mr. Wills.[1] Det. Gregory never said that the Sheetz was robbed or that Mr. Wills was a suspect in a crime that took place there. In fact, Det. Gregory suggests that Mr. Wills might have become inadvertently involved in another's wrongdoing. *Id.* at 1:51:18–1:51:33 ("So listen man. Shit happens. You get wrapped up in some shit, you are there before you know what the fuck is going on, it is happening."). Then, when Mr. Wills denied going to the Sheetz, Det. Gregory accepted his response and resumed his questions that facially focused on Mr. Reeves as a suspect in other

---

[1] The government only brings up this exchange in arguing that Mr. Wills' statements were voluntary. ECF No. 149 at 8. It is unclear if the government believes it is relevant to the *Miranda* waiver analysis.

crimes. This brief exchange did not change Det. Gregory's explicit message that he was interested in Mr. Reeves and was only questioning Mr. Wills about crimes in which he was "not a suspect." Mr. Wills was deceived as to the nature of the investigation and the government cannot persuasively argue otherwise.

### II. The Officers' Deception Was Material to Mr. Wills Waiving His *Miranda* Rights at the Outset and Throughout the Interrogation.

The evidence also conclusively shows that the "misinformation was material in [Mr. Wills'] decision to speak with the police." *Giddins*, 858 F.3d at 884 (quoting *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983)) (internal brackets omitted). The officers' deception fundamentally changed Mr. Wills' calculus about whether he should exercise his rights to remain silent or confer with a lawyer. Based on the officers' explicit and implicit misrepresentations, Mr. Wills believed that the officers were merely holding him on an unknown warrant and using the opportunity to gather information about Mr. Reeves, Mr. Wills' troubled nephew in whom the officers had a particular interest. Had Mr. Wills known that the officers intended to extract from him inculpatory statements regarding a homicide and series of robberies with which he would soon be charged, he would not have hesitated to invoke his rights.

This conclusion is underscored not only by common sense, but also Mr. Wills' conduct during the interrogation which showed that Mr. Wills was sensitive to police attempts to gather evidence against him. Before the bulk of Det. Gregory's questioning, Det. Gregory let Mr. Wills retrieve his mother's phone number from his cell phone. After Det Gregory took the phone from the room, Mr. Wills expressed concern that there was "something that you looking for in my phone" and that Det. Gregory was being "sneaky." Ex. 1-B at 22:20–22:45. He then asked to have the cell phone back so that he could personally power it down. *Id.* at 22:45–23:05. Clearly concerned, Mr. Wills threatened to remain silent and told Det. Gregory that "if I can't see my

9

phone and power it down in front of you . . . this conversation's not even gonna happen." *Id.* at 23:05–23:25. Along similar lines, Mr. Wills attempted to invoke his right to an attorney when he was served with the DNA search warrant. *Id.* at 6:39:52–58 ("Well, we talking anything about DNA, not until I get my lawyer."). It was at this moment that Mr. Wills realized, at long last, that he was the officers' target all along. Mr. Wills was insistent upon speaking to a lawyer, telling the officer multiple times that he would not give his DNA without a lawyer present. Only after Mr. Wills read the warrant did he agree to having his DNA collected. *Id.* at 6:40:01–6:41:00. Clearly, these are not the actions of a person who unthinkingly speaks to police without counsel when he knows he is the target of a serious investigation. The Court can safely conclude that without the officers' deception, Mr. Wills would have invoked his rights.

### III. *United States v. Giddins* Is Directly on Point and Requires Suppression.

As evident from the parties' pleadings, *Giddins* is the Fourth Circuit precedent that speaks most directly the *Miranda* issue here. While the government tries in vain to distinguish *Giddins*, it is directly on point and leads to suppression here.

*Giddins* involved a bank robbery suspect who voluntarily came to a Baltimore police station to pick up his car—a car which police knew was connected to a series of bank robberies. The suspect was taken to an interrogation room and questioned about the robberies, but police assured him that he was not in trouble because he was only there to pick up his car. The officers eventually read a *Miranda* warning, prefacing it by saying that they had to read the suspect his rights because "his car was involved in a crime." When the officers revealed that they believed the suspect participated in the robberies, the suspect invoked his right to silence and the officers arrested him on an outstanding warrant that was issued the day earlier. The Fourth Circuit held

10

that the suspect's *Miranda* waiver was not knowing, intelligent, and voluntary because the officers deceived the suspect as to the true nature of the investigation. *Id.* at 884.

While the government would distinguish *Giddins* because Mr. Wills, unlike the *Giddins* suspect, knew that he was under arrest, ECF No 149 at 7, this argument ignores both the object of the legal challenge and the greater significance of the evidence in this case. The central question is not only whether the officers lied to Mr. Wills about whether he was under arrest, but more broadly whether they "misled him as to the true nature of their investigation." *Giddins*, 858 F.3d at 884. Deceiving a person about if he is a suspect undermines his ability to make a knowing, intelligent, and voluntary choice about whether he needs to remain silent or have a lawyer present. After all, the knowledge that police are actively gathering evidence they intend to intend to use against one would entirely change the picture and would prompt many reasonable people to avail themselves of silence and an attorney.

Putting the government's superficial distinction aside, the parallels between this case and *Giddins* are unavoidable:

- In *Giddins*, the officers told the suspect they only wanted to talk to him because his car was involved in a crime. In this case, Det. Gregory told Mr. Wills that he only wanted to talk to him about crimes in which he was "not a suspect" and the officers communicated explicitly and through their questions that they were only investigating the crimes of others, primarily Mr. Reeves.
- In *Giddins*, the officers failed to tell the suspect he had a warrant and said he was not in trouble. In this case, Det. Gregory falsely told Mr. Wills he did not know why he had a warrant, implying that he would not be questioning him about the case that caused his arrest.

11

- In *Giddins*, the officers told the suspect that they were only reading him *Miranda* because "his car was involved in a crime." In this case, Det. Gregory told Mr. Wills that he only had to read Mr. Wills his rights because he was in the interrogation room, and "for the technicality."

- Finally, in *Giddins*, the suspect invoked his rights when the officers explicitly told the suspect they believed he was involved in the bank robbery. In this case, Mr. Wills attempted to invoke his rights when he was served the DNA warrant and it became clear that the officers were attempting to gather evidence against him and not only others.

In sum, while there is always some factual texture that differs case to case, *Giddins* and Mr. Wills' interrogation are critically similar in that the officers' deception deprived Mr. Wills of making an informed and intelligent choice. *Giddins* is on point and demands suppression in this case.

**IV.     The Booking Exception Does Not Go So Far as the Government Suggests.**

Finally, the government briefly invokes the so-called "booking exception" to the *Miranda* rule, arguing that some of Mr. Wills' statements, such as his recitation of his phone number, should be admitted notwithstanding any *Miranda* violation. ECF No. 149 at 9. Without knowing which the precise statements the government believes falls within the booking exception, it is impossible to fully respond to this argument. However, it seems the government has already misapprehended the scope of the exception in general and its specific application in this case.

It is true that "there exists an exception to *Miranda*'s coverage for routine booking questions securing 'biographical data necessary to complete booking or pretrial services.'" *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990)). "Under this exception, certain questions asked for the *purpose* of booking a

12

suspect who has been arrested are exempt from *Miranda's* coverage, and the answers are thus admissible even if no *Miranda* warnings have been given." *United States v. Guess*, 756 F. Supp. 2d 730, 740 (E.D. Va. 2010) (emphasis in original). That said, this rule does not give police license to ask "questions, even during booking, that are designed to elicit incriminatory admission." *Munis*, 496 U.S. at 604 n.14 (quoting government's *amicus* brief). Thus, numerous courts have noted that when an "officer has reason to know that a suspect's answer may incriminate him, what once was an innocuous routine question may take the form of an incriminating question that is then covered by *Miranda. Guess*, 756 F. Supp. 2d at 741–42 (discussing *United States v. Henley*, 984 F.2d 1040 (9th Cir. 1993) and holding that asking the defendant if he owned a vehicle did not fall within the exception because the question was "reasonably likely to elicit an incriminating response"); *United States v. Mateo*, 392 F. Supp. 3d 454, 468 (D. Vt. 2019) (rejecting booking exception when DEA agent asked defendant's cell phone number because answer "would likely draw a connection . . . between [defendant] and a key piece of incriminating evidence").

The government's citation to the booking exception is off base here for at least two reasons. First, Det. Phillip's questions—including those about Mr. Wills' cell phone number—were clearly not "for the *purpose* of booking a suspect." *Guess*, 756 F. Supp. 2d at 740. Det. Phillip, a homicide detective from Prince George's County, had arrived at the Charles County Sheriff's office to question Mr. Wills because he was suspect in the January 18 murder, not to lend a hand in the booking process. Because this was not a booking at all, the booking exception cannot properly be applied. Second, and even if Det. Philips was participating in Mr. Wills' booking, the exception would still not apply because the detective's questions were aimed at gathering incriminating evidence against Mr. Wills. Det. Philips was seeking to tie Mr. Wills to a particular cell phone, a potentially important piece of evidence. Again, this is a scenario where the booking exception has

no place. The Court should reject the government's efforts to salvage Mr. Wills' unlawfully obtained statements.

Respectfully submitted,

James Wyda
Federal Public Defender
 for the District of Maryland

____/s/_____
Andrew R. Szekely (#16407)
Nate Smith (#813194)
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-3976
Email: andrew_szekely@fd.org
         nate_smith@fd.org