**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. TDC-22-0048** |
| | * | |
| **KEIONTA SHAWN HAGENS,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | * | |

\*\*\*\*\*\*\*

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its undersigned counsel, hereby submits the following Sentencing Memorandum for the purpose of informing the Court and defense counsel that the Government anticipates requesting a total sentence of 240 months imprisonment at the sentencing hearing scheduled for February 14, 2025, at 9:30 a.m., which sentence the Government believes is sufficient, but not greater than necessary pursuant to 18 U.S.C. § 3553(a).

**I.**    <u>**Procedural Background and Crimes of Conviction**</u>

On October 25, 2024, the defendant, Keionta Shawn Hagens, was found guilty after jury trial of the following crimes as charged in the Second Superseding Indictment (ECF 225):[1]

**Count One** – Conspiracy to Interfere with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951(a) (7-Eleven, Ollie's Bar and Grill, Food Zone),

**Count Two** – Interference with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951(a) (Ollie's Bar and Grill),

---

[1] The above list includes the names of businesses related to the counts of convictions.

**Count Three** – Use, Carry and Brandish a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c) (Defendant was convicted of the lesser included offense of Use and Carry) and,

**Count Six** – Interference with Interstate Commerce by Robbery in violation of 18 U.S.C. § 1951(a) (Food Zone).

During the nine-day trial, evidence was presented and proven beyond a reasonable doubt that the defendant participated in a series of crimes including Hobbs Act robberies and a carjacking that were committed with the brandishing or use of at least one firearm. As described in the Presentence Investigation Report ("PSR") filed as ECF 296, the crimes included in the Count One conspiracy were a 7-Eleven robbery and carjacking on November 12, 2020, the robbery of Ollie's Bar and Grill on November 17, 2020, and the robbery of the Food Zone convenience store on January 18, 2021. *See* PSR ¶¶ 7-11. The crimes charged substantively for which the defendant was convicted were the Ollie's Bar and Grill robbery and use of a firearm during and relation to the robbery (Counts Two and Three) and the Food Zone robbery (Count Six).

## II.    <u>Sentencing Guidelines</u>

The Government agrees with the Guidelines calculations in the PSR. According to the PSR the final combined offense level for Counts One, Two and Six is 30. *See* PSR at ¶ 50. The defendant's criminal history category was calculated as VI based upon a total of 14 points. PSR at ¶¶ 76-78. With an offense level of 30 and a criminal history category of VI, the advisory Guidelines range is 168 to 210 months imprisonment. PSR at ¶ 135. For Count Three, the defendant was convicted of a violation of 18 U.S.C. § 924(c)(1)(A) with the finding that he used and carried a firearm during and in relation to a crime of violence. Pursuant to 18 U.S.C. § 924(c)(1)(A)(i) and U.S.S.G. § 2B3.1(a) 2K2.4(b), the Guidelines sentence is the minimum term

of imprisonment provided by statute or five years.  Under 18 U.S.C. § 924(c)(1)(D)(ii) this sentence shall be consecutive to any term of imprisonment imposed for Counts One, Two and Six.

### A.    Offense Level Calculations

The Defendant is challenging the calculation of the offense level for Count 1, Hobbs Act Conspriacy.  For Guidelines purposes, under U.S.S.G. § 1B1.2(d), a "conviction on a count charging a conspiracy to commit more than one offense, shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit."  The conspiracy charged in Count One was a conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a).  The conspiracy included three offenses of Hobbs Act robbery conspiracy, namely the 7-Eleven, Ollie's and Food Zone.   Commentary Note 4 to U.S.S.G. § 1B1.2(d) states that in cases where the verdict does not establish which offenses were the object of the conspiracy, "subsection (d) should only be applied with respect to an object offense alleged in the conspiracy, if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense."  Thus, for Count One, the Government agrees that for determining the base offense level, the Government must prove that the defendant conspired to commit each of the robberies beyond a reasonable doubt.

For the Ollie's and Food Zone robberies, the defendant was convicted of substantive counts for these crimes.  Thus, there is proof beyond a reasonable doubt that he conspired to commit each of those robberies.

There is also proof beyond a reasonable doubt that the defendant conspired to commit the 7-Eleven robbery.  As the Court instructed the jury in this case, to find the Defendant guilty of the crime of Hobbs Act Robbery Conspiracy, the Government must establish each of the following elements beyond a reasonable doubt:

First, that two or more persons entered into the unlawful agreement charged in Count 1, specifically an agreement to engage in the crime of Interference with Interstate Commerce by Robbery; and

Second, that the defendant in question knowingly and willfully became a member of the unlawful agreement charged in Count 1.

Jury Instruction 72. *See also* Jury Instructions 71 (Purpose of Conspiracy Charge); 73 (First Element: Existence of an Agreement); 74 (Second Element: Membership in the Conspiracy).

Here the evidence presented at trial proves beyond a reasonable doubt that the Defendant was part of an unlawful agreement to interfere with interstate commerce by robbery including the 7-11 robbery and that he knowingly and willfully became a member of that unlawful agreement. To begin, from the surveillance video, victim testimony, 911 recordings, and stipulation, there is no question that a Hobbs Act robbery of the 7-Eleven occurred, where money and merchandise was taken from the store with firearms being brandished during the commission of the crime.

Moreover, the evidence proved that the robbery of the 7-11 was part of the Hobbs Act Robbery conspiracy for which the Defendant was convicted. The Ollie's robbery took place five days after the 7-Eleven robbery and there are numerous connections that show the robberies were committed by the same individuals, and at the very least that the two robberies were part of the same Hobbs Act Robbery conspiracy. This evidence includes the following.

For the Ollie's robbery, the evidence, including the surveillance video, showed the Defendant and co-defendant Wills traveled to Ollie's in a stolen Ford F-150 pickup truck. Still images from Ollie's surveillance recordings showing the stolen Ford F-150 were admitted at trial. *See* Trial Exhibit 168D1, below. The 7-Eleven robbers traveled to the 7-Eleven in a dark colored pickup truck that resembled the stolen Ford F-150 used during the Ollie's robbery. Evidence admitted at trial included a still image from the 7-Eleven surveillance recording which showed the

stolen Ford F-150, as well as a carjacked Dodge Ram taken from Victim-2 during the 7-11 robbery, leaving in tandem after the robbery and carjacking.  *See* Trial Exhibit 121U, below.

Both the stolen Ford F-150 and the carjacked Dodge Ram taken from Victim-2 during the 7-Eleven robbery were found side-by-side in a remote location in the area of Simms Lane in Brandywine, Maryland, on November 26, 2020.  *See* Trial Exhibit 221, below.  Evidence connected with the Ollie's robbery, including a stolen ATM and DVR, was found in the immediate vicinity of the stolen Ford F-150 used in the Ollie's robbery and the carjacked Dodge Ram from the 7-Eleven robbery.  In addition, Government witness Andron Wood testified that he observed both the Ford F-150 and the Dodge Ram parked at the same Simms Lane location when he was at that location with the Defendant and Wills before and after the Ollie's robbery, and that the Defendant and Wills used the F-150 to commit the Ollie's robbery.



**Trial Exhibit 168D1: Stolen Ford F-150 Used During Ollie's Robbery**



**Trial Ex. 121U: Vehicle that Appears to be Stolen Ford F-150 During 7-Eleven Robbery**



**Trial Ex. 221: Carjacked Dodge Ram from 7-Eleven Robbery and Stolen Ford F-150 Used in Ollie's Robbery Found Next to Each Other in area of Simms Lane**

Clothing and DNA evidence further connects the Defendant and Wills to the 7-Eleven and Ollie's robberies, and those crimes to each other. The Defendant wore blue latex gloves during the Ollie's robbery. *See* Trial Exhibit 168F, below. The Government submits that the evidence shows that the Defendant was the suspect wearing blue latex gloves in the 7-Eleven robbery. *See* Exhibit 121E, below. As mentioned above, the Dodge Ram carjacked during the 7-Eleven robbery and the stolen Ford F-150 used on the Ollie's robbery were found next to one another in the remote area near Simms Lane, where the Defendant and Wills used to store the vehicles. Inside the Ford F-150 was a box of blue latex gloves, and a used blue latex glove. *See* Trial Exhibits 268 and 260, below. A DNA expert testified at trial that the chance DNA from the exterior glove was from some unknown person that was not the Defendant was 1 in 2.3 sextillion. Further, the DNA expert testified that the change the DNA from the interior of the glove was from some unknown person that was not the Defendant was 1 in 2.7 nonillion.



**Trial Ex. 121E: Defendant Wearing Blue Latex Gloves during 7-Eleven Robbery**

7



**Trial Ex. 168F: Defendant Wearing Blue Latex Gloves during Ollie's Robbery**



**Trial Ex. 268: Blue Latex Gloves Found in Stolen Ford F-150**



**Trial Ex. 260: Blue Latex Glove with Defendant's DNA in Stolen Ford F-150**

Furthermore, the 7-Eleven carjacking victim, Victim-2, testified that he worked for a business known as Profish, and that he had a Profish pullover in his carjacked Dodge Ram. The trial evidence showed that a like Profish jacket was found in the stolen F-150 when recovered by police in the area of Simms Lane next to the carjacked Dodge Ramon November 26, 2020. *See* Trial Exhibit 285, below. The Defendant was wearing what appears to be the same Profish pullover during the Ollie's robbery. *See* Trial Exhibit 168K1, below.



**Trial Ex. 285: ProFish jacket in Dodge Ram stolen during 7-11 Robbery (Nov. 12, 2020).
Recovered in Stolen Ford F-150 from Simms Lane (Nov. 26, 2020)**



**Trial Ex. 168K1: Defendant wearing Profish jacket during Ollie's robbery (Nov. 17, 2020)**

The above evidence regarding the clothing and blue latex gloves worn by the Defendant in the 7-Eleven and Ollie's robberies is further reinforced by the evidence showing that Wills wore different clothing and gloves in the Ollie's and 7-Eleven robberies. During the Ollie's robbery, Wills wore a dark zip-up sweatshirt with an emblem on the left chest and bleach stains on the sleeve. *See* Trial Exhibit 168G1, below. The second suspect in the 7-Eleven robbery, which the Government submits that the evidence shows was Wills, was wearing what appears to be the same dark zip-up sweatshirt with an emblem on the left chest and bleach stains on the sleeve, as well as a red glove. *See* Trial Exhibit 121P, below. What appears to be the same red glove was found in the stolen Ford F-150 used in the Ollie's robbery when it was recovered next to the carjacked Dodge Ram from the 7-Eleven robbery in the area of Simms Lane. *See* Trial Exhibits 265 and 283, below. The DNA expert testified at trial that the chance DNA from two cigarettes located near the red glove in the cupholder of the For F-150 was 1 in 2.7 nonillion and  in 5.8 nonillion.



**Trial Ex. 121P: Wills Wearing Sweatshirt with Emblem, Beach Stains, and Red Glove during 7-Eleven Robbery**



**Trial Ex. 168G1: Wills Wearing Sweatshirt with Emblem, Bleach Stains during Ollie's Robbery**



**Trial Exhibits 265 and 283: Red Glove Recovered from Stolen Ford F-150**

From this evidence and the similar manner in which both robberies were committed, there is proof beyond a reasonable doubt that (1) the Defendant and Wills conspired to interfere with interstate commerce by robbery, including the 7-Eleven robbery; and (2) that the Defendant knowingly and willfully became a member of the conspiracy.  Thus, the base offense level calculation of 25 for Count One in the PSR, for the 7-Eleven robbery designated as "Group 1 (Count 1)" is correct.

In addition to the base offense level for the Hobbs Act Robbery conspiracy involving the 7-Eleven, there are enhancements for the carjacking of the Dodge Ram during that robbery and brandishing a firearm.  Under U.S.S.G. § 1B1.3(a)(b) the base offense level for jointly undertaken criminal activity includes all acts or omissions "within the scope of jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity that occurred during the commission of the offense, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  Likewise, pursuant to U.S.S.G. § 2X1.1(a), the base offense level for a conspiracy conviction is the offense level "for the substantive offense, plus any intended offense conduct that can be established with reasonable certainty."  In making Guidelines calculations, the Court can consider

conduct that was established by a preponderance of the evidence, as long as the Guidelines sentence is treated as advisory and does not exceed the statutory maximum. *See United States v. Freitekh*, 144 F.4th 292, 317–18 (4th Cir. 2024), and *United States v. Brooks*, 524 F.3d 549, 562 (4th Cir. 2008). For the 7-Eleven robbery conspiracy, the PSR correctly found enhancements for carjacking under U.S.S.G. § 2B3.1(b)(5) and for firearm brandishing under U.S.S.G. § 2B3.1(b)(2)(C), as the evidence showed by a preponderance of the evidence and with reasonable certainty, at a minimum, that these actions took place as part of the 7-Eleven robbery conspiracy. PSR ¶¶ 20, 26 and 27. With these enhancements, the offense level for the 7-Eleven robbery conspiracy of Count One is 27, making the final combined offense level for the groups associated with Counts One, Two and Six as 30. PSR ¶ 47.

## B.     Alternative Offense Level Calculations

If the Court chooses not to find beyond a reasonable doubt that the defendant committed the crime of Hobbs Act robbery conspiracy in connection with the 7-Eleven robbery, then the Government contends that the 2-level carjacking enhancement related to the 7-Eleven robbery still applies because the taking of the truck of Victim-2 and its contents was in preparation for other Hobbs Act robberies committed by the Defendant and his co-conspirators. Such conduct is in line with the ways, manners and means of the charged conspiracy which included forcefully taking and obtaining motor vehicles "to be used in ways including facilitating robberies, or to escape from robbery scenes." ECF 225, Second Superseding Indictment, ¶ 7(c).

In addition, in determining the offense level, relevant conduct as defined in U.S.S.G. § 1b1.3(a) can be considered and § 5K2.1 provides that a departure may be warranted if a death resulted. For Guidelines purposes, relevant conduct does not include acquitted conduct "unless such conduct establishes, in whole or in part, the instant offense of conviction." U.S.S.G. §

1b1.3(c).  While the defendant was acquitted of the murder of Mr. Jang, he still was convicted of a robbery and a robbery conspiracy where firearms were used in furtherance of the goals and objectives of the conspiracy, i.e. successful robberies. Furthermore, for the Food Zone robbery, the threats to Mr. Jang, and force utilized, including threats with firearms, before the shooting, overlap and include the commission of the robbery for which the defendant was convicted.  And it is undisputed that the Food Zone robbery resulted in the death of Mr. Jang.  For these reasons, the Government contends that the death of Mr. Jang, during the robbery for which the defendant was convicted, can be utilized for Guidelines calculation purposes and to consider any appropriate departure.

Therefore, assuming the Court did not find beyond a reasonable doubt the Defendant is guilty of conspiracy with respect to the 7-Eleven robbery, with the 2-level carjacking enhancement and no other guideline adjustments or departures, the offense level for Count One would be 22, and the combined offense level for Counts One, Two and Six would be 25.  With an adjustment or departure based on the death of Mr. Jang during the course of the Food Zone robbery for which the Defendant was convicted, the offense level and Guidelines calculations would be commensurably higher.

### C.    Defendant's Criminal History Category

In their sentencing memorandum, the defense argues that the PSR overrepresents the defendant's criminal history category.  The defense seeks a downward departure from a criminal history category of VI to V, pursuant to U.S.S.G. § 4A1.3(b).  The Government disagrees with the defense.  The defendant's criminal history includes convictions for offenses involving controlled substance possession and distribution, firearm possession, assault, and resisting arrest. Furthermore, the defendant's experience with those convictions did not deter him from later

14

engaging in a series of robberies where firearms were used. For these reasons, the Government contends that the defendant's criminal history category does not substantially over-represent the seriousness of his criminal history, or the likelihood that he will reoffend.

## III.    Analysis of Sentencing Factors under 18 U.S.C. § 3553(a)

Under 18 U.S.C. § 3553(a), the Court shall impose a sentence sufficient, but not greater than necessary, after considering various factors relevant to the crimes of conviction and the defendant. In imposing sentence, the Court is free to consider all information concerning the defendant's background, character and conduct. 18 U.S.C. § 3661. Government counsel has considered these factors in making its sentencing recommendation of 240 months imprisonment, which factors include those set forth below. Further, the Government submits that this sentence is within the Guidelines range as calculated by the Government and the United States Probation Office, but in the event that the Court finds different Guidelines calculations, the Government submits that a variance to 240 months imprisonment would be warranted in light of the 18 U.S.C. § 3553(a) factors.

### a.  Nature and Circumstances of the Offense

The crimes of conviction involved three commercial robberies, and a carjacking committed with the use of at least one firearm in each robbery. Victims of the robberies were employees and customers of the businesses who were threatened, and for Ollie's, an employee was bound with zip ties. The carjacking victim was likewise threatened with a firearm before he handed over the keys to his truck. And, as shown on the Food Zone surveillance video, Mr. Jang was coldly shot

and killed during the Food Zone robbery when he resisted the robbers demands.[2]   As described below, the Defendant was an active participant in these robberies:

First, as discussed above, the evidence shows that the Defendant and Wills committed the 7-Eleven robbery, which was included as one of the robberies in the Hobbs Act Robbery conspiracy charged in Count 1.  During this robbery it was the Defendant – wearing the blue latex gloves – that brandished a firearm at Victim 2, took his keys, and drove away in Victim-2's Dodge Ram, while both the Defendant and Wills robbed the store. *See, e.g.*, Trial Exhibits 121Q and 111 at 5:34:53 AM, below.



**Trial Exhibit 121Q: Defendant Taking Dodge Ram Keys from Victim-2 During 7-Eleven Robbery**

---

[2] The Fourth Circuit has held that district courts can consider acquitted conduct in determining an appropriate sentence. *United States v. Freitekh*, 144 F.4th 292, 316-318 (4th Cir. 2024).  *Freitech* was decided before the November 1, 2024 effective date of § 1b1.3(c), however in cases where the acquitted conduct overlaps and borders with the convicted conduct, the Government contends that the Court can still consider the acquitted conduct as relevant conduct in imposing an appropriate sentence under 18 U.S.C. § 3553(a).



Ex. 111 at 5:34:53 AM

**Trial Exhibit 111 at 5:34:53 AM: Defendant Carjacking Dodge Ram During 7-Eleven Robbery**

A review of the defendant's actions from the surveillance recording of the Ollie's robbery showed the Defendant having a role equal to Wills and taking advantage of Wills' use and brandishing of a firearm, in that among other things, the Defendant jumped over the counter, bound victims with zip ties, stole money and items from the business, dragged a customer across the floor

who entered the business before the robbery concluded, and helped carry an ATM out of the business. *See, e.g.*, Trial Exhibits 169A, 1, and 168S, below.



**Trial Exhibit 168F: Defendant and Wills with Firearm Committing Ollie's Robbery**



**Trial Exhibit 168P: Defendant and Wills after Defendant Zip Tied Ollie's Victims**



**Trial Exhibit 168S: Defendant and Wills Stealing Ollie's ATM**

Likewise for the Food Zone robbery, the Defendant traveled to the store with his co-defendants, entered the store with co-defendants, posed as a customer as did his co-defendants, took a belt off the display rack, attempted to reach inside the window to the clerk's station, told Mr. Jang to get off the phone, left the store with the belt he had removed from the store display rack, and fled the scene with co-defendants after Mr. Jang was shot. *See, e.g.*, Trial Exhibits 57H, 57J and 57K, below.



**Trial Exhibit 57H: Defendant with belt in hand pulling on cashier booth window**



**Trial Exhibit 57J: Defendant at counter while Mr. Jang was on Phone**



**Trial Exhibit 57K: Defendant at counter while Mr. Jang was on Phone**

While the Defendant did not have a firearm in his possession, he was not substantially less culpable than his co-defendants as he went to the Food Zone to commit and reap the benefits of the robbery that had been planned by him and his co-defendants.

### b. History and Characteristics of the Defendant

The PSR contains comprehensive information about the Defendant's criminal history, personal and family history, mental and emotional health, and use and abuse of controlled substances. From the PSR and information learned by the Government during the investigation, the defendant's use of controlled substances has been significant. On top of that, the Defendant has documented mental health issues. Although Government counsel believes that the Defendant knowingly and voluntarily committed the subject robberies and was driven by the potential reward from the robberies, the Government likewise believes that Wills was the leader and motivating force behind the commission of these crimes. Nonetheless, the Defendant willingly and actively participated in the crimes for which he was convicted, as presented at trial and discussed above.

### c. The Needs for the Sentence

The Government contends that the recommended sentence fulfills the needs listed in § 3553(a)(2). Under the facts and circumstances of this case, a sentence of 240 months or 20 years is significant and just punishment, affords deterrence, protects the public and is long enough to provide needed corrective treatment.

## IV. Restitution

The Government intends to seek restitution in the amount of $13,259 for the Ollie's robbery. A list of items taken and their values was admitted as Exhibit 202 at trial. The restitution for Ollie's appears in paragraph 146 of the PSR. The Ollie's clerk, Victim-3, has submitted a

victim-impact statement seeking restitution in the amount of $2,426.25 for medications he has been prescribed and taken as a result of the trauma inflicted by the Ollie's robbery.

**V.**     **Conclusion**

Based on the foregoing, Government counsel requests that the Court sentence the defendant to 180 months imprisonment for Counts One, Two and Six, and a consecutive sentence of five years for Count Three, for a total sentence of 240 months imprisonment.   The Government contends that such a sentence is sufficient, but not greater than necessary and is consistent with 18 U.S.C. § 3553(a).   This is an appropriate sentence within the advisory Guidelines range advocated for by the Government, and even if the Court finds the advisory range to be lower, the Government contends that this sentence is appropriate as a departure from the advisory range in accordance with U.S.S.G. § 5K2.1 and U.S.S.G. § 1b1.3(c), or as an upward variance, based upon the killing of Mr. Jang during a robbery that was part and parcel to the robbery for which the defendant was convicted.

The Government expects at least one member of the Jang family to appear at sentencing and to provide victim-impact testimony.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:   /S/ _____
William D. Moomau
Patrick D. Kibbe
Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 31st day of January, 2025, the foregoing sentencing recommendation was filed electronically and thus served on defense counsel.

   /S/                        

William D. Moomau
Assistant United States Attorney
